No. 82-455

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

KENNETH R. GRAHAM,

Defendant and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Jack D. Shanstrom, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kenneth R. Graham, pro se, Deer Lodge, Montana

For Respondent:

Mike Greely, Attorney General, Helena, Montana
Ted Lympus, County Attorney, Kalispell, Montana

Submitted: June 30, 1983

Decided: September 29, 1983

Filed:SEP 29 1983

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Kenneth Reynolds Graham appeals from a judgment based on a jury verdict convicting him of deliberate homicide in the District Court, Eleventh Judicial District, Flathead County. We dismiss the appeal as having no merit and thereby affirm the District Court judgment.

Graham was convicted May 6, 1982. He was represented by court-appointed counsel before and during the trial. Following the trial, he instructed his court-appointed counsel that he did not wish to be represented by that counsel at the sentencing hearing. He asked the court to dismiss his counsel, but the District Court decided that Graham could conduct his own sentencing hearing with court-appointed counsel standing by to advise him on procedure if need be. Accordingly, Graham, acting in propria persona, called and interrogated witnesses, and argued his case to the District Court. At the conclusion of the hearing, the District Court sentenced Graham to serve 75 years in the Montana State Prison, with an additional 10 years imposed for the use of a dangerous weapon, the terms to be served consecutively.

Graham filed his notice of appeal to this Court. Before he had filed his notice of appeal, his court-appointed counsel wrote to him advising him of the deadline for appeal, confirming their understanding that Graham did not desire the attorney's further assistance unless requested, and again advising Graham of the necessity of procuring a transcript. On September 2, 1982, upon learning that Graham had not perfected his appeal by obtaining transcripts, the attorney

again wrote to Graham and advised him of the statutory deadlines which he must meet to perfect his appeal.

On September 14, 1982, court-appointed counsel received a letter from Graham contradicting his previous statements and advising the attorney that Graham expected his appeal to be handled by the attorney. To protect Graham, the attorney moved the District Court for an extension of time of 90 days within which to transmit the record, which was granted by the District Court.

When the attorney was advised by the court reporter that the 90-day deadline could not be met in time to prepare the transcript, the attorney again acted to procure a stipulation from the State that Graham could have an additional 90 days from November 11, 1982, in which to transmit the record.

The transcript on appeal was filed in this Court on January 11, 1983. On February 8, 1983, the attorney moved the court for an order extending the time for filing Graham's brief for an additional 30 days, or until March 12, 1983. That motion was granted by this Court, with the notation on the order that "[n]o further extensions [of time] will be granted."

On February 24, 1983, the attorney moved this Court for permission to withdraw as counsel of record for Graham. The attorney attached to his motion an affidavit which included a letter from Graham instructing the attorney to withdraw as counsel of record for Graham and denying that Graham had earlier advised the attorney to go forward with Graham's appeal. The attorney further reported by affidavit that Graham had continued in his attempts to frustrate the handling of his case, had repeatedly refused to reply to correspondence by counsel, had refused to provide payment for

fees incurred, and had attempted to inject error into his case by discrediting his counsel. This Court granted leave to the attorney to withdraw as counsel of record for Graham on February 28, 1983.

On March 22, 1983, Graham filed in this Court his motion for an extension in which to file his first brief. This Court on March 28, 1983, granted Graham an additional 90 days within which to file his first brief, again with the notation that no further extension would be granted.

On June 27, 1983, there was filed with this Court a typewritten but unsigned motion for extension of time by Graham requesting an additional 60 days in which to prepare his brief on appeal based upon his contention that his legal papers were locked up in storage in maximum security and that he had no way of getting them out and that the person who was helping him with his appeal had left the prison for an unknown length of time. This Court on receipt of that motion, denied the same and ordered that Graham's cause on appeal be determined on the basis of the papers now filed.

From the inception of court proceedings in this cause, Graham made the prosecution difficult over whether he would be represented by an attorney. On his first appearance in the District Court, on December 18, 1981, he appeared without an attorney. He told the court that he had attempted to call attorneys but that he was only allowed one telephone call per week while he was in jail. On order of the court he was given unlimited use of the telephone as far as engaging counsel was concerned and the District Court set another hearing for December 22, at which time he was to either have counsel or there would be counsel appointed for him.

On December 22, 1981, he again appeared without an attorney but the public defender in Flathead County appeared with him because he and Graham had been in contact. However, Graham wanted an attorney of his own choosing, claiming that he had assets out of which fees could be paid. The court continued the matter until December 30, 1981.

On the latter date, the defendant again appeared without an attorney, but the court had been informed that an attorney from Polson, Montana, would represent the defendant and the court accepted that, and set the arraignment of Graham for January 7, 1982.

On January 18, 1982, Graham appeared with his counsel from Polson, and entered a plea of not guilty to the charge of deliberate homicide.

On March 26, 1982, Graham appeared for a hearing. There was pending before the court a motion by the Polson counsel to withdraw as attorney for Graham. The Polson attorney claimed that Graham had failed to cooperate with him and had failed to pay the fees upon which they had agreed. Graham contended that the Polson attorney had not done the pretrial investigation work that was necessary. The Polson attorney informed the court of the work that he had done and the necessity for some depositions which would have to be paid for by Graham. At this hearing, the District Court appointed a public defender to defend Graham, upon the stipulation that the fees incurred would be paid out of the property of the defendant. Throughout the proceedings thereafter, and through trial, Graham was represented by this attorney. The affidavit of this attorney filed in this Court indicates that during the trial there were disagreements with Graham over the methods of handling his case and whether certain

- 5 -

witnesses should have been subpoenaed and called to aid Graham in his defense.

The right of Graham to represent himself in criminal proceedings is constitutional. Art. II, § 24, 1972 Mont. Const., gives a person accused of a crime the right to appear and defend in person and by counsel. It is the position of this Court that the right of a party in a judicial proceedings to represent himself will be honored, and that we will be tolerant of the layman's lack of familiarity with procedure or with legal principles insofar as it does not affect the merits of the cause or the jurisdiction of the court. When, however, it is time to apply legal principles to reach a decision in a cause, even though one of the parties is represented by himself, a layman, those principles will be applied fairly and impartially, without regard to whether one or other of the parties was represented by counsel.

In the procedure of this appeal, we have been tolerant with Graham. He has been granted several extensions, both for his transcript and for his first brief. Despite this tolerance, we do not have the advantage of receiving from Graham his first brief, within which would be contained his assignments of error as far as his judgment of conviction is concerned. Because he has failed to file a brief, there is nothing of record in this Court for the State to reply to, and so we do not have the advantage of a brief from the State. We have before us only the District Court file, and the transcript of proceedings that includes the various steps taken leading up to his arraignment, the appointment of counsel, the trial, and the eventual sentencing hearing.

Hon. John C. Sheehy
Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana   59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

Date:
October 18, 1983

Re:
State v. Graham, No. 82-455, Sept. 29, 1983

Page 7, line 10 --- 238 P.2d 1907 should read 238 P.2d 907.

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165

In a civil case, on this kind of appellate record, we could dismiss the appeal for lack of prosecution. In this cause, however, because it involves a death by gunshot, and a long prison sentence, we have on our own combed the record before us for any hint that would raise a debatable question as to Graham's conviction. We have taken the position that if the record revealed a debatable question as to the propriety of his conviction, he would have a constitutional right to have his case reviewed by this Court. State v. Robuck (1951), 125 Mont. 613, 238 P.2d 1907.

We have examined the record from the viewpoint of four common appellate issues: (1) the sufficiency of the evidence to support the conviction; (2) possible instructional error by the District Court; (3) possible inadequate assistance of counsel; and, (4) harsh, cruel or unusual punishment in the sentencing.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTION

The test for the sufficiency of the evidence to support the judgment of conviction is whether there is substantial evidence to support the conviction, viewed in a light most favorable to the State. State v. Lamb (Mont. 1982), 646 P.2d 516, 39 St.Rep. 1021. The resolution of factual matters is for the jury, and if there is substantial evidence to support the judgment, this Court must affirm the decision of the jury. State v. Hardy (Mont. 1980), 604 P.2d 792, 37 St.Rep. 1. Disputed questions of fact and the credibility of witnesses will not be considered on appeal. State v. DeGeorge (1977), 173 Mont. 35, 566 P.2d 59. These are the rules that apply to appeals where the defendants are represented by counsel and we apply those same rules to this cause, where Graham is representing himself.

- 7 -

Kenneth Reynolds Graham married Susan Piburn about 10 years before her death occurred. Three children, all girls, were born as a result of the marriage. At the time of her death, Graham was unemployed, his last job having been at a youth camp located near Lakeside, Montana. Susan was a medical technician and microbiologist, and had been employed until her death by hospitals in Kalispell and Ronan.

The marriage was rocky. Susan's parents testified at the trial that Graham had been violent in his treatment of Susan. They also testified that he had complained to them that Susan had been unfaithful, and was not a fit mother. They and others testified that Susan was a passive, somewhat submissive type of person, whereas Graham contended that although she appeared this way most of the time, there were occasions when she would "explode" and became uncontrollable. On those occasions he found it necessary to sit on her until she "calmed down" after which he would let her go.

In the weeks prior to the death, a dissolution of marriage action had been filed, and because custody of the three girls was involved the parties had been referred for counseling in accordance with the practice in the Flathead County District Courts. The counselor testified that he had examined both parties and had determined that Graham had been violent with Susan. He had not yet made his recommendation to the District Court as to custody, but Graham felt that his recommendation would be that Susan was to have the children. This agitated Graham very much since he felt that he was the person who should have custody, and he was very strongly attached to his daughters.

Graham claims that Susan wrongfully told the counselor and others that he had committed marital rape upon her in

some instances, and had sexually molested the three girls. Graham testified that the latter accusation really disturbed him.

After the dissolution proceedings had been filed, Susan had moved out and was living with a girlfriend in Kalispell. The girlfriend, when Susan first came to her home, noticed bruises on Susan's face, and reported the presence of those bruises to the Flathead County Rape Crisis Center, which also took care of battered women.

The death occurred after a period of separation of about five weeks. On about November 11, 1981, Susan came to the trailer in which Graham was living with the three daughters about 7:30 in the evening. Before she left her girlfriend's house to go to the trailer, she had been advised by both the girlfriend and the girlfriend's husband not to go into the presence of Graham alone.

What happened in the trailer comes mostly from Graham himself. He said that she came into the trailer, barely said "hi" to the three girls, although she had not seen them for two weeks. This casual greeting seemed to make Graham angry and he upbraided Susan for it. They got into an argument in front of the children which was very abusive, at least verbally. Graham eventually told the three girls to go back to their bedroom and to wait there. In the meantime, Susan was demanding that she be given some "papers," which are not otherwise identified in the transcript. Graham testified that Susan could take such papers as belonged to her, and for that purpose he unlocked a bedroom door in the trailer home so that Susan could go in and procure her papers. He waited for some time and when she came out from the bedroom, Graham said that she was carrying some papers under her left arm and

in her right hand, covered with a blue paper of some kind, was the pistol in a holster, which she was drawing out of the holster. He reached for the gun and a struggle ensued. He states that while they were struggling, they fell over onto a beanbag chair, and while she was in that position, he pulled the trigger of the gun, which had come into his hands. He admits pulling the trigger once. Susan was actually shot twice by a .357 magnum gun with hollow-point bullets. He states that he does not remember pulling the trigger twice but contends that this particular gun was a fast, double-action gun and would fire two shots almost simultaneously.

Susan's body was lying on the floor, and he covered it with objects so as to hide the body from the children. He testified that he went to the bedroom where the girls were, and told them that their mommy was dead and that he had shot her. He did not immediately call the police. Instead he called his mother and informed her that Susan was dead. She stated that she and perhaps some members of her family would come immediately as soon as they checked the airlines. Her testimony was that upon checking the airlines, she discovered that no planes came to Kalispell from her home until 5:00 the next afternoon. When her son called back about whether she was coming, she gave him this information and she advised him to call the sheriff.

Graham testified that following the death, he talked to his mother, and was trying to determine whether the sheriff would arrive. He said he was told by Susan before her death that she had instructed her girlfriend that if Susan had not returned to the girlfriend's house within one-half hour, the girlfriend was to call the sheriff.

At any rate, it was not until the next morning at 11:00 that officers arrived at the scene and discovered Graham, with the girls waiting in the pickup, loading their goods into the truck. He was placed under arrest and the investigation into the death then followed.

A teacher of one of the daughters did testify that in that fall she had noticed that the daughter was crying in school and seemed inattentive and staring out into space. Upon inquiry, the daughter told the teacher that her mother had left and this was the cause of the difficulty. The teacher then had two subsequent conversations with Graham, in which the teacher determined from Graham that the mother had left without reason, and that her impression was that Graham really loved the girls and the girls loved him very much.

Graham's own testimony as to how the death occurred is important. He testified:

> ". . . And she came out of the living room and down the hall and I saw her in the hall with a gun. She was just pulling the gun out of the holster. She had the papers tucked--this blue folder tucked under this arm, holding the holster with this hand and, you know, when I saw her, you know, the barrel of the .357 was appearing.. . . I made a grab for the gun and I pushed the gun up so it wasn't pointing toward me. Also I didn't want it pointing down the hall where the children were. And Susan was two inches taller than I am, so she had little reach advantage on me.. . . She had full control of the gun. My hand was kind of over hers at that point. We were struggling over the gun. We ended up falling. I don't know if we tripped over the couch, the corner of the couch or what. But we landed on the beanbag chair face to face like this, with the gun. And at that point I was able to get the gun. I had more of the grip. I was twisting it out of her hand. She had, after I had been twisting it out of her hand, she had both hands on the barrel of the gun, or on the gun that time. And I had the handle portion of the gun in my control.. . . Her right hand was on the barrel and the left hand was probably down around the cylinder.. . . And then when I was trying to twist the gun out of her grasp, at that time I started raising up and over her, to twist the gun out of

her grasp, get it away from her.. . . That is when the shots fired."

On cross-examination, Graham testified:

"Q. It was pointed at her then. A. Yes.

"Q. At what part of her. A. Just at her.

"Q. Well, here or here? A. No, at her head.

"Q. It was pointed at her head. A. Yeah.

"Q. And you were holding onto the business end, the butt, the trigger part? A. Yes.

"Q. She still had a hold of the front. A. I think she had ahold of it at that time.

". . .

"Q. And the gun was pointed at her head? A. Yes.

"Q. And you had control of it. A. I had partial control of it.

"Q. And what did she say. A. She said, she screamed that I was a child molester.

". . .

"Q. And what was your reaction to that? How did you feel when she called you that? It made you mad, didn't it? A. Yes.

"Q. It made you mad before when she called you that, hadn't it? A. Yes.

". . .

"Q. And you were mad? A. I was in a situation where it was a matter of madness. I was reacting, you know.

"Q. How did you react? A. In a situation--

"Q. How did you react? A. I pulled the trigger.

"Q. You pulled the trigger, didn't you? A. Yes.

"Q. You intentionally pulled that trigger, didn't you? A. No.

"Q. Well how did you pull the trigger? A. I pulled, I did it. I don't know. Out of instinct or reaction."

Essentially Graham was convicted out of his own mouth. His was the only testimony as to what actually happened at

the trailer at the time of Susan's death. Substantially and effectively his testimony supports the jury's verdict that he had committed deliberate homicide.

## POSSIBLE INSTRUCTIONAL ERROR

During the settlement of the instructions, no specific objection was raised by counsel for Graham to any of the instructions eventually given by the court. Because Graham has not submitted a brief in this case, he does not assign any instructional error.

We have, however, examined the instructions. The court instructed the jury on the elements of deliberate homicide, mitigated deliberate homicide, and negligent homicide. It submitted four possible verdicts for the jury to consider including one for each of the three described crimes and one not guilty verdict. The jury was instructed on knowledge and purpose, reasonable doubt, direct and circumstantial evidence, and how the jury should weigh and determine the facts. We find no error in the instructions as given, and find that the jury was fairly and properly instructed as to the crime charged and any lesser-included crimes which the jury may have found.

## POSSIBLE INADEQUATE ASSISTANCE OF COUNSEL

Because Graham has not filed a brief or any other instrument which would detail instances in which he contends he did not receive adequate assistance of counsel, we have searched the record itself for any indication of inadequacy. We find none. Only in a copy of a letter which Graham wrote post-trial to his attorney is there any indication that Graham was dissatisfied with the work that his counsel did for him during the trial. Counsel's own affidavit, of

- 13 -

course, reflects that he was having disagreements with Graham as to how the trial should be handled.

We do find in Graham's letter to counsel his contention that if the attorney had subpoenaed "the evidence I asked for, and [got] the witnesses I asked you to" then Graham wouldn't be in the position of contending his counsel did nothing for him. Graham contends there were at least five people that the attorney didn't even talk to once, and that the attorney did not get medical records from California or Wyoming which might have supported his claims.

These references apparently are to contentions made by Graham during the trial that his wife had brutally treated one or more or the girls on prior occasions, and that the witnesses could testify to the fact that Susan had been cruel in her treatment of the children. Graham also contended during the trial that before she was killed, Susan had written a will in which she had stated that if she were found dead that her husband was the "murderer." Graham claims that the attorney did nothing to find this will. However, one of the witnesses testified at trial that Graham himself had told the witness that he had found the will in her purse after her death. The county attorney reported to the court that they were unable to find a purported will in their investigation.

We have quoted foregoing the evidence upon which the jury found Graham guilty. Regardless of what Susan may have done with respect to her children in the time prior to their proposed dissolution of marriage, and irrespective of what she may have written in a purported will, the convincing force of the evidence from Graham himself, makes it certain that any such additional evidence or witnesses would not serve the purpose of providing a defense to the charges

against him.  If error occurred on the part of counsel, and we have no record that it did, it would almost certainly have been harmless in this case.

### THE SENTENCE WAS HARSH, CRUEL OR UNUSUAL

Under the circumstances of this case, it cannot be said that the District Court erred in sentencing Graham to 75 years for the homicide which the jury found he committed, nor for assessing an additional 10 years to be served consecutively for his use of a weapon.  These are statutory penalties.  Moreover, Graham has had his sentence reviewed by the Sentence Review Board, which left his sentence undisturbed.

We have reviewed the foregoing possible contentions of Graham with respect to this cause only for the purpose of making certain that since he was representing himself we might by some omission have failed to find a reason why his conviction should not be sustained.  Graham has failed to file a brief which would outline or indicate to the Court a single ground of error upon which he relies.  We find no error, and accordingly, we dismiss this appeal with prejudice as being without merit, thereby affirming the judgment of conviction in a district court.


_____
Justice

We Concur:

_____
Chief Justice

- 15 -

Daniel J. Shea

Fred J. Fisher

Frank B. Mancini
Justices

- 16 -